NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RINGWOOD BOARD OF EDUCATION, :<br><br>　　　　　　Plaintiff, :<br><br>　　　　v. :<br><br>K.H.J., on behalf of K.F.J., :<br><br>　　　　　　Defendant. : | **Hon. Dennis M. Cavanaugh**<br><br>**OPINION**<br><br>Civil Action No. 03-CV-4636 (DMC) |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before this Court upon an Appeal by Ringwood Board of Education ("Plaintiff"), of a decision issued by the Honorable Carol Cohen, A.L.J. ("A.L.J."), regarding K.F.J. under the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1400 et seq. Plaintiff filed a motion for summary judgment and K.H.J. ("Defendant"), on behalf of K.F.J. ("K.J"), filed a cross motion for summary judgment. No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, Plaintiff's motion to vacate the ALJ's decision is **granted** and Defendant's cross-motion for summary judgment is **denied**.

## I. BACKGROUND

### A. K.J's Disabilities

For the first two years of his life, K.J. lived with his biological mother, who was

diagnosed as addicted to drugs, bipolar, depressed, and violent. (Defendant's Brief in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Br.") at 8). K.J. began living with Defendant when he was twenty-three months old and Defendant legally adopted him through the New Jersey Division of Youth Services when he was four years old. (Plaintiff's Brief in Support of its Motion for Summary Judgment ("Pl. Br.") at 6). When K.J. began living with Defendant, she had him evaluated by the Hackensack University Medical Center ("HUMC"), who diagnosed him as having moderate delays. (Def. Br. at 5). HUMC again evaluated K.J. during the Spring of 2001. (Id.) HUMC determined K.J. functioned in the average to below average range for his age, with weaknesses in reading and language arts. (Id. at 6-7). HUMC discovered K.J. has weaknesses in reading, writing and sound-letter association, which interfere with his ability to read at grade level. (Id. at 7). The evaluation also stated that K.J. has auditory processing weaknesses, which impact his ability to read and write. (Id.)

While K.J. was attending a pre-K learning disabled program, Defendant met with the Ringwood Child Study Team ("CST") on June 19, 2001. (Id.) Together, they determined K.J. was eligible for special education services pursuant to IDEA. (Id.) Defendant then enrolled K.J. in the Ringwood Public School system in September of 2001. (Id.) Prior to K.J.'s enrollment in the Ringwood School District, HUMC re-evaluated K.J. (Pl. Br. at 15). In this evaluation, K.J. recieved an IQ test score of 94, which placed him in the average intelligence range. (Id.) The Ringwood CST did not perform their own evaluation of K.J., but relied on the HUMC's prior evaluations. (Def. Br. at 8). Using the HUMC evaluations, K.J.'s CST designed an Individual Education Program ("IEP") for first grade, which stated K.J. would receive resource room

instruction for language arts and reading. (Id.) His IEP also stated K.J. has Attentional Deficit Hyperactivity Disorder ("ADHD"), average intellectual functioning, central auditory processing weaknesses in the area of auditory integration, and academic achievement within the average to low average range. (Plaintiffs Appendix to its Brief in Support of its Motion for Summary Judgment ("Pl. App.") Volume I, Exhibit 4). K..J. was also diagnosed as "Other Health Impaired" on his IEP. (Def. Br. at 5).

K.J. began suffering from behavior problems during the 2001-2002 school year and as a result, HUMC performed another evaluation. (Def. Br. at 8). HUMC referred K.J. to Dr. Julia Chase-Brand, who diagnosed K.J. as having bipolar disorder and an adjustment disorder. (Id.) In her report issued on March 21, 2002, Dr. Chase-Brand stated K.J. is a "delightful, active, creative child who showed highly elevated mood but good behavioral control during the session." (Defendant's Appendix to her Brief in Opposition to Plaintiff's Motion for Summary Judgment ("Def. App.") Exhibit 3). She also diagnosed him with having a bipolar disorder. (Id.) On his mental status, she stated he is "quite engageable and cooperative. . . his affect is bright and shows a full range." (Id.) During their meeting his speech became "revved up" and "more and more rapid and loud" at certain times. (Id.) Finally, she stated that "[c]ognitively, he seems quite bright but was not formally tested. (Id.) She placed him on medication for his bi-polar disorder and his attention deficit problem and recommended a "wait and see" strategy. (Id.)

On May 12, 2002, HUMC re-evaluated K.J. in preparation of the 2002-2003 school year. (Def. App. Ex. 13). HUMC found K.J. to be a student functioning within the "average to below average" range. (Id.) He displayed average skills in mathematics, mathematical reasoning,

science, social studies, spelling, phonological processing, orthographic processing and the humanities. (Id.) He was assessed as being "below average range" with reading, writing, and the establishment of sight word vocabulary. (Id.) K.J.'s cognitive functioning included "low verbal skills and average skills in cognitive efficiency, visual spatial thinking, short-term memory, and phonemic awareness." (Id.) His listening comprehension was diagnosed as within average range, while his reading comprehension was diagnosed as below average range. (Id.) Based on this evaluation, HUMC stated K.J. would benefit from "intensive remediation in reading and written expression" and the use of an "Orton-Gillingham method of instruction." Id.

These tests also indicated K.J. had a Full Scale IQ of 114, which was a significant increase from his last IQ test, where he scored 94. (Pl. Br. at 15). On July 19, 2002, K.J.'s CST took HUMC's evaluations into consideration and adjusted K.J.'s IEP for second grade. (Id. at 9). His new IEP stated K.J. would continue to receive resource room instruction on reading and language arts. (Id.) In addition to continuing with that aid, he would also receive one-to-one reading and language arts instruction with a multi-sensory approach for twenty minutes every school day. (Id.). The second grade program called for K.J. to attend general education classes for all other subjects. (Id. at 12).

On June 4, 2002, K.J's CST met for his IEP's annual review. (Plaintiff's Appendix ("Pl. App.") Volume I Exhibit 8). His IEP stated that while K.J. resisted attempting tasks he perceived as too difficult, his behavior, attention span, and interaction with his peers had all improved. (Id.) It also stated that K.J. has strong auditory skills and that he was able to absorb

more material in the classroom. (Id.) The IEP stated that K.J.'s behavior did not interfere with classroom instruction and could be addressed through general education combined with instruction from special education teachers. (Id.) The CST also determined K.J. should receive extended school year instruction in the form of tutoring for two hours per week during the month of July. (Id.) Defendant requested Plaintiff provide K.J. with a personal aide but the CST determined K.J. needed to learn to rely on himself. (Id.)

The IEP took HUMC's recommendation that the Orton-Gillingham instruction be used with K.J. into consideration and determined that this method would be used through an additional daily individual Resource Center session. (Id.) Finally, it stated that placement in a special school, where all of his peers would be disabled students, would be inappropriate. (Id.) The CST found K.J. would benefit "academically, emotionally, and socially" from placement within the Ringwood School District. (Id.). The CST found his placement in Ringwood to be the least restrictive and appropriate environment for K.J. to continue his education. (Id.)

Then on June 6, 2002, HUMC issued a Diagnostic Impression Report that diagnosed K.J. with a learning disability that primarily affecting reading and written expression; an overall high average of intellectual functioning based on his average verbal IQ and his superior performance IQ; bipolar disorder; ADHD; and an adjustment disorder. (Def. App. Ex. 14). Based on these findings, HUMC recommended K.J. and Defendant continue working with K.J.'s CST for intensive remediation with reading and writing and that the Orton-Gillingham instruction be continued. (Id.) HUMC also recommended individual psychotherapy, parent counseling, and

family sessions. (Id.)

Defendant became unsatisfied with his academic and social growth and on July 12, 2002, Defendant filed a pro se request for mediation and due process with the Department of Education, Office of Special Education Programs. (Def. Br. at 2). Specifically, Plaintiff requested an "out of district placement" for her son. (Id.) The ALJ heard testimony over the course of several days in December of 2003 and April and May of 2003. (Pl. Br. at 6). On August 18, 2003, the ALJ found Plaintiff failed to provide K.J. with an appropriate education and ordered that K.J. be placed at the Banyon School. (Pl. Br. at 6). Plaintiffs have now filed an appeal before this Court and a motion for summary judgment. Defendant has filed a cross motion for summary judgment.

### B. The Administrative Law Judge's Findings

After much testimony, the ALJ made a number of factual findings. The ALJ determined that during the 2001-2002 school year K.J. made little progress with his reading and that the District failed to develop any valid or measurable means to determine whether K.J. had progressed with his reading. K.H.J., OAL DKT. NO. EDS 07360-02. The ALJ further determined the amount of time spent with K.J. using the Orton-Gillingham method was "insufficient to bring K.J. up to grade level in reading and writing." Id. Finally, the ALJ found K.J. to be two years behind his grade level in reading and writing and that he required intensive teaching using the Orton-Gillingham method. Id. The ALJ ruled that the most appropriate program for K.J. would be placement outside of the Ringwood School District in the Banyon

School, which offers a program providing the Orton-Gillingham approach. Id.

## II. DISCUSSION

### A. Standard of Review for Summary Judgment

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). The moving party bears the burden of showing either (1) there is no genuine issue of fact and it must prevail as a matter of law; or (2) that the non-moving party has not shown facts relating to an essential element of the issue for which he bears the burden. Celotex, 477 U.S. at 331. If either showing is made then the burden shifts to the non-moving party, who must demonstrate facts that support each element for which he bears the burden and must establish the existence of genuine issues of material fact. Id. The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, Fed. R. Civ. P. 56(e), but must produce sufficient evidence to support a jury verdict in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

### B. Standard of Review

Pursuant to 20 U.S.C. § 1415, this Court has jurisdiction over appeals regarding special education decisions issued by an ALJ. The Third Circuit recently issued an opinion clarifying the standard of review district courts must employ when reviewing ALJ decisions in S.H. State-operated Sch. Dist. of the City of Newark, 336 F.3d 260 (3d Cir. 2003). In S.H. the Court

officially adopted the modified de novo standard of review, where district courts give "due weight" to the underlying administrative proceeding. See Id. at 270. Giving "due weight" to ALJ decisions requires district courts to consider factual findings from the administrative proceedings prima facie correct. Id. (quoting M.M. v. Sch. Dist. Of Greenville County, 303 F.3d 523, 530-31 (4th Cir. 2002)). A district court reviewing an administrative fact finder in the first instance must defer to the ALJ's factual findings unless "it can point to contrary non-testimonial extrinsic evidence on the record." Id. If a district court does not adhere to the ALJ's factual findings, it must explain the reasoning behind its departure. Id. (quoting Id. at 531). This does not mean a district court may "substitute its own notions of sound educational policy for those of local school authorities." Id. (quoting Id.). District courts must give an ALJ's factual conclusions "sufficient deference" Id. at 271.

### C. Free and Appropriate Education

The IDEA provides educational funding to states on the condition that each state provide a "free and appropriate public education" to all disabled children. 20 U.S.C. § 1400(d)(1)(A). A free and appropriate public education ("FAPE") is defined in part as "special education and related services that . . .are provided in conformity with the individualized education program required under §1414(d) of this title." 20 U.S.C. § 1401(8). Although there is no substantive definition of "appropriate" within the statute, the United States Supreme Court held that a state satisfies the FAPE requirement by "providing personalized instruction with sufficient support services to permit the child to benefit educationally from the instruction." Bd. of Ed. of the

Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176, 203 (1982).

While the Supreme Court requires states to provide a certain level of education, states must only provide disabled students with an education "sufficient to confer some educational benefit upon the handicapped child." Id. at 201. The Third Circuit applied this reasoning in T.R. v. Kingwood Tp. Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 1999) and held IDEA requires school districts to confer "meaningful" educational benefits that allow disabled students to "achieve significant learning." (quoting Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 182-84 (3d Cir. 1988)). Requiring school districts to bestow a "meaningful" educational benefit upon disabled students does not mean districts must "maximize the potential of handicapped children." Id. (Quoting Rowley, 458 U.S. at 197). The relevant inquiry is not whether a disabled child's IEP is providing an optimal benefit, but rather whether the student's IEP is providing a meaningful benefit. M.A. v. Voorhees Township Bd. Of Educ., 202 F.Supp. 2d 345, 361 (D.N.J. 2002). The Supreme Court stated in Rowley, "whatever Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education." 458 U.S. at 197, n.21. In order to determine a school district has conferred a meaningful educational benefit onto a handicapped child, courts must look to the child's IEP. S.H. 336 F.3d at 267. The School District carries the burden of showing a placement is appropriate. Id., (quoting Fuhrmann v. East Hanover Bd. of Educ., 993 F2d 1031, 1034-35 (3d Cir. 1993).

I disagree with the ALJ's determination that Plaintiff failed to provide K.J. with an appropriate education because the evidence shows Ringwood conferred a meaningful educational

benefit on K.J. The ALJ found K.J.'s education at Ringwood to be inappropriate largely because he could not read on his grade level. K.H.J., OAK DKT. NO. EDS 07360-02. While K.J. may not have been reading at grade level at the time the ALJ hearing, he had made substantial progress with his reading and writing. (Pl. App. Vol. I, Ex. 8). Although K.J. has an IQ score that indicates he has the potential to perform at grade level, he is also diagnosed as being bipolar, having ADHD, and as having weaknesses in reading and language arts. (Def. Br. at 6-7). As discussed above, a school district is not required to maximize the potential of a disabled student. Rowley, 458 U.S. at 197. Instead, a district is only required to provide a "meaningful educational benefit" that is more "than trivial." S.H. 336 F.3d at 267. K.J. showed improvement throughout his time in the Ringwood School District in many areas including reading and writing. K.J. entered the first grade with an IQ of 94, behavioral problems, attention difficulties, and reading and writing problems. He showed improvement in all of these areas by the end of the year. It may be true that his academic potential could be maximized in an out of district placement. However, so long as Plaintiff provides K.J. with a meaningful educational benefit, Plaintiff has met its burden. Plaintiff has done so here. Therefore, this Court disagrees with the ALJ's determination that Plaintiff failed to provide K.J. with an adequate education.

### D. Least Restrictive Environment

In addition to providing disabled students with an appropriate education, the IDEA requires school districts to establish procedures assuring handicapped children are educated with non-disabled children to the greatest extent that is most appropriate. T.R, 205 F.3d at 578. This

is known as "mainstreaming," or placing the child in the "least restrictive environment" ("LRE"). 20 U.S.C. §1412(a)(5)(A). The Third Circuit has set forth a two prong test courts must use to determine whether a School District complies with the IDEA's LRE requirement. First, a court must decide if the school can educate the child in a regular classroom with the use of supplementary aids and services. S.H., 336 F.3d at 272. Second, if a child cannot be educated in a regular classroom, the court must decide whether the school is mainstreaming the child to the maximum extent possible. Id. However, a School District must first demonstrate the LRE "satisfactorily educates" the disabled child. Id., (quoting Carlisle Area Sch. v. Scott P., 62 F.3d 520, 535 (3d Cir. 1995)). If a court does not find the educational environment appropriate, the court does not need to go further with the analysis and decide if it is the least restrictive. S.H. 336 F.3d at 272.

The ALJ ordered that K.J. be placed out of district at the Banyon School, a school where K.J. would only be educated with other disabled students. K.H.J., OAL DKT. NO. EDS 07360-02. At the hearing, much testimony was heard on the benefits K.J. would experience from being with other non-disabled students his age. K.H.J., OAL DKT. NO. EDS 07360-02. The Banyon School cannot provide K.J. with this type of interaction. Due to the fact that this Court found that Plaintiff did provide K.J. with an appropriate education, this Court also finds that placement in the Ringwood District Plaintiff would be the LRE and most appropriate for K.J. An IEP meeting must now be held to determine the the most appropriate LRE for K.J. within the Ringwood District.

### E. Defendant's Request for Attorney's Fees

Pursuant to the IDEA, the court has discretion to award attorney's fees and costs to the parents of a child in an IDEA case that is the prevailing party. U.S.C.A. § 1451(i)(3)(B). This Court has vacated the ALJ's determination, therefore Defendant is no longer the prevailing party. Defendant's request for attorney's fees is denied.

### III. CONCLUSION

For the reasons stated, it is the finding of this Court that Plaintiff's motion for summary judgment is granted and Defendant's cross-motion for summary judgment is denied. Further, this Court orders that an IEP meeting be held to determine the appropriate in-district educational plan for K.J. An appropriate Order accompanies this Opinion.

_____
Dennis M. Cavanaugh, U.S.D.J.

Date:       November 22, 2005
Original:   Clerk's Office
Cc:         All Counsel of Record
            The Honorable Mark Falk, U.S.M.J.
            File